Filed 4/2/14  P. v. Rebolledo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F065714 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 12CM8658) |
| OSCAR REBOLLEDO, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna L. Tarter, Judge.

Rachel P. Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Oscar Rebolledo appeals following jury trial and his subsequent convictions for burglary, criminal threats, stalking, spousal abuse, vandalism, and simple assault. He asserts that (1) the trial court erred in failing to stay the sentence imposed for stalking, because the threats underlying the stalking and criminal threats convictions were made with the same intent and objective; (2) defense counsel was ineffective for failing to object to photographs of text messages sent by defendant as the messages were improperly authenticated; (3) the trial court erred by instructing the jury that defendant's prior acts of domestic violence could be used as propensity evidence as to the vandalism charge, and that the word "abuse" in that context meant the destruction of personal property; (4) the trial court erred in failing to sua sponte instruct the jury with a unanimity instruction as to the burglary, criminal threats, and spousal abuse charges, thereby lessening the prosecution's burden of proof and violating defendant's federal due process rights; and (5) his federal due process rights were violated by the trial court's exclusion of evidence supporting his theory of the case. We affirm.

## FACTUAL BACKGROUND

In 2011, Mayra Marquez advised defendant, who was then incarcerated, that she was seeing another man. The two had an on-again, off-again relationship since March of 2005 and had two children in common.

In April 2012, defendant asked Marquez if she was dating someone else. She replied in the affirmative and identified the individual. Defendant became angry and called her a "bitch." Thereafter, defendant would text or call her "all the time." She estimated she received up to 50 calls and/or text messages a day. Sometimes the messages indicated defendant loved her; yet in others he called her derogatory names, used profanity, and threatened to jeopardize her employment by contacting her employer and suggesting she was under the influence of drugs. In other messages he would tell her to watch her back and threatened to "mess with" her car. In one message, defendant indicated he regretted having children with her.

2.

More particularly, on April 24, 2012, Marquez began receiving threatening text messages from defendant about 6:00 a.m. She received about 10 messages before ultimately receiving a telephone call from defendant about 9:40 a.m. while she was at work. Defendant indicated he was inside her apartment, he had a gun, and he was going to "fuck up" her car. Marquez was afraid. Believing defendant was at her apartment because he described where her car was parked and noted its recently affixed spare tire, Marquez asked a coworker to drive her home.[1]

Shortly after she arrived, Marquez saw defendant coming from the upstairs area near her apartment. He was wearing her sweatpants and sweatshirt; the clothes had been folded on top of her bed when she left for work that morning. When Marquez asked him what he was doing and why he was wearing her clothes, defendant replied he got into the apartment through a window. Marquez headed upstairs to see if anything was broken or "messed with." Defendant followed her.

Marquez went into her bedroom and defendant followed her inside, closing and locking the door. He grabbed her, struck her on the arm and head, and began choking her. When she told him she could not breathe, he let her go. Defendant then hit her in the head with a closed fist and slammed her to the ground. He held her arms down and kept his knees along the sides of her body. Then he tried to kiss her and have sex with her, "but it didn't happen."

Eventually defendant released Marquez and she went into the bathroom. There, defendant spit in her face and hit her with an open hand. She told him "just to leave." Defendant told Marquez she "ha[d] to be with him" and she told him "[h]e was full of shit." Defendant became angrier and tried to cut himself with a knife. He tried to cut his neck, but she did not see any blood. He scratched his face with his fingernails and told

---

[1]Marquez's brother George Marquez was home as he was her roommate at the time.

Because several witnesses share the same last name, we will refer to some by a first name to avoid confusion. No disrespect is intended.

Marquez that "[i]f he was going to go to jail, so was [she]." She washed her face and eventually defendant left the apartment.

Marquez testified defendant did not have permission to be in her apartment, nor did he have keys to the apartment. On that same date, she noticed a window screen had been removed from one window. Although her brother George was present in the apartment at the time, he did not leave the living room to come to her aid. At the time, George was dating defendant's sister, Socorro.

As Marquez was leaving the apartment to return to work, defendant scratched the front and sides of her car. Once she got to work, Marquez continued to receive text messages from defendant. He claimed he was going to contact her employer, and he would not stop "'til one of us dies." He also indicated an intent to return while Marquez was asleep "like [he] did to George." Further, defendant claimed he had used the knife to stab "someone that has AIDS," and that he was going to hurt the other man she was seeing.

Marquez was afraid of defendant. She had scratches and bruises on her arms and neck caused by defendant.

On cross-examination, Marquez acknowledged she told a police officer that defendant told her he had keys to the apartment. Marquez also acknowledged that despite being afraid of defendant, she did not want to call the police. She did not think he would do anything to her, and he was on parole so she did not want him to get in trouble. Marquez denied that a week prior to this incident, defendant told her he did not want to get back together with her, although she did acknowledge there was a discussion about getting back together for the kids' sake.

On redirect, Marquez testified about an incident in 2008 when she lived in Coalinga. On that occasion, defendant used a flashlight to break the living room windows of her apartment because she refused to respond to his text messages and calls. She called police and defendant was arrested.

Marquez's coworker, Mayra Mendoza, testified she drove Marquez from their place of employment to her apartment on April 24, 2012. When they arrived, defendant was there, wearing Marquez's clothes. Mendoza recalled Marquez asking defendant why he was wearing her clothes, and that defendant followed Marquez upstairs to the apartment. Mendoza stayed in her car, but after 15 minutes, she went upstairs to check on Marquez.

George opened the door and Mendoza asked if his sister was okay. George replied that she was fine. Mendoza could see Marquez in her room; it appeared defendant was preventing her exit. Mendoza subsequently returned to work alone.

Mendoza testified Marquez returned to their workplace about 30 to 45 minutes later. She was crying, nervous, and angry. There were bruises on Marquez's arms and neck that had not been there earlier that morning. Mendoza called the police and an officer arrived about 10 minutes later.

George testified that on the morning of April 24, 2012, he had been asleep on the living room floor when there was a knock on the door and the doorbell sounded. Defendant was at the door and George let him in. After advising defendant that his son was not home, George went back to sleep while defendant remained on the couch. About one to two hours later, he woke up because his sister's friend was asking whether his sister was going back to work. Marquez stepped out of her bedroom and asked George to tell her friend she would drive herself. George did not notice anyone in Marquez's bedroom with her; he did not know where defendant was.

George testified that while he used to date defendant's sister Socorro, the two had not dated in more than a year. He acknowledged seeing Socorro in court and sitting with her and defendant's family the day before, and he did so because he got along with them. He no longer speaks with his sister because she asked him to leave the apartment.

George recalled speaking with an officer on April 24, 2012, but he had just woken and was "shooken up." That is why he did not know how to answer the officer's questions and told the officer he did not want to get involved and that he did not know

5.

anything. George also recalled speaking with a district attorney investigator on the phone, but when he took the call he thought it was concerning a job interview. As a result, he did not recall the conversation and claimed to have a "short-term memory" such that he could not recall events as recent as two weeks ago, but could recall those of three months prior. George denied telling the investigator that Marquez deserved the trouble she gets herself into. Although Marquez claimed defendant had hurt her physically, George did not believe his sister because she has a history of lying.

On cross-examination, George testified he understood he lied to the officer about not having any information on the date of the incident, but he did not think it was serious at the time. Because he understood the seriousness at trial, his testimony was truthful. George let defendant into the apartment, he went back to sleep because he had had a long night, and he woke again when Marquez's coworker knocked on the door. He would not lie for defendant. He did not see any bruises on Marquez's neck and her arms were covered. George testified that he loves his sister even though she is a liar.

Police officer Chris Martinez responded to a call for assistance at 10:30 a.m. on April 24, 2012. He contacted Marquez; she was crying, shaken, and scared. The officer found it difficult to take Marquez's statement because she was upset and emotional, and did not tell her story in chronological order.

Martinez also contacted George later that morning. It appeared as though George had just gotten up for the day. It also appeared he did not wish to talk to the officer. In response to nearly every question posed, George indicated he did not want to get involved and did not know what had happened between Marquez and defendant. George never advised Officer Martinez that he let defendant into the apartment that morning.

Kings County District Attorney investigator Rod Huckabay spoke with George by telephone on July 23, 2012. After identifying himself, Huckabay asked George how he was going to testify in court. George said he would testify he saw nothing and heard nothing, and he was not going to say anything. On that same date, George admitted he was in a relationship with defendant's sister Socorro.

6.

Former Coalinga police officer Deborah Ireland testified that on April 8, 2004, she contacted Belen Rebolledo, defendant's ex-wife, at her place of employment, an eye doctor's office. Ireland was familiar with Belen because the eye doctor was her personal physician. She was also familiar with defendant from prior contacts with him in the city. Belen reported defendant had slashed her tires and had perhaps broken into her storage unit.

Belen's right front tire had been slashed. While Ireland was speaking with her, Belen received a phone call from defendant. Belen held the phone up so the officer could listen. Ireland recognized the voice on the other end of the line as belonging to defendant. Defendant said something to Belen like, "this is going to keep happening until you realize."

Following his arrest on April 22, 2004, defendant admitted to Officer Ireland that he had slashed Belen's tire because he was angry she refused to return his phone calls and was dating other people.

**PROCEDURAL HISTORY**

On July 30, 2012, the Kings County District Attorney filed a first amended information alleging defendant had committed the following crimes: count 1—burglary of an inhabited dwelling (Pen. Code,[2] § 459); count 2—criminal threats (§ 422); count 3—stalking (§ 646.9, subd. (a)); count 4—false imprisonment (§ 236); count 5—misdemeanor vandalism (§ 594, subd. (a)); count 6—willful infliction of corporal injury (commonly referred to as spousal abuse) (§ 273.5, subd. (a)); and count 7—assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)). It was further alleged as to all counts that defendant had been previously convicted of stalking (§ 646.9, subd. (a)) and had served a prior prison term within the meaning of section 667.5, subdivision (b). That same date, defendant entered pleas of not guilty and denied all allegations.

_____

[2]Unless otherwise indicated, all further statutory references are to the Penal Code.

7.

Following a three-day trial, the jury returned guilty verdicts as to the burglary, criminal threats, stalking, vandalism, and spousal abuse charges. Additionally, the jury found defendant guilty of simple assault (§ 240) as a lesser included offense of count 7, and found true the allegation that he entered the residence at a time when another person was present therein. Defendant was found not guilty of the crimes of false imprisonment and assault by means of force likely to produce great bodily injury.[3]

On August 29, 2012, defendant was sentenced to a total of nine years eight months in state prison. He was also ordered to pay various fines, penalties and fees.

## DISCUSSION

### I.    The Applicability of Section 654 to Counts 2 and 3

Defendant contends the trial court erred when it failed to stay the sentence imposed on the criminal threat conviction because he harbored the same intent and objective as to the stalking and criminal threat crimes. Hence, he asserts he can be punished only once pursuant to section 654. Plaintiff maintains defendant formed separate intents and objectives and had time to reflect between acts. Therefore, the trial court did not err and its findings are supported by substantial evidence.

#### A.    The Relevant Proceedings Below

During closing argument, the prosecutor summarized the testimony and particularly referenced the various text messages sent both before and after the physical altercation at Marquez's apartment. The prosecutor then expressly referenced the crimes of criminal threats and stalking:

> "[PROSECUTOR:]  [Defendant]'s also charged with criminal threats. Did he communicate a threat to [Marquez]? Yes. We saw several of them on these text messages. Was [Marquez] scared? Was she in sustained fear of those threats? And you heard her. She said as the day progressed, especially at night, I was afraid. I thought he was going to hurt me.

---

[3]On July 31, 2012, defendant admitted he had suffered a 2004 Fresno County conviction for stalking.

8.

"Stalking. Was he harassing her? Absolutely. He had sent her 15, 16 text messages before 7:00 in the morning. And he continued to send her text messages throughout the day. He called her at work. To prove the defendant guilty of stalking, People must prove the defendant willfully and maliciously harassed or willfully, maliciously and repeatedly followed another person. 15 text messages before 7 a.m. is harassment. Calling somebody at work and telling them that I'm going to fuck up your shit is harassment. Beating somebody up and, then, within an hour texting her a threat is harassment. The defendant made a credible threat with the intent to place the other person in reasonable fear for her safety. Round two, I won't stop 'til one of us dies."

In rebuttal to defense counsel's closing argument, the prosecutor contended the following:

"[PROSECUTOR:] … And [Marquez] did not call the police after she received all of those text messages [on the morning of April 24, 2012]. Because she was mad, yes. But when she received those text messages and she had gone over to the house, she had not been threatened yet— threatened with her person, yet. He had threatened her property when she had gone over to the house. But if you look at the text messages, he started threatening her person after she got back from her apartment. I won't stop 'til one of us dies. If you look, the time is 12:52 in the afternoon. The next text message, I'm spraying his house tonight. That occurred 3:25. By the knife I had stabbed someone that has AIDS, so you know you do, [*sic*] that's 3:27. 1:22, I won't stop 'til one of us dies tonight. It's good to be worst. Do sleep. I'll walk in apartment [*sic*] when you are asleep, like I did to George. That was at 1:22."

Following defendant's convictions, sentencing proceedings were held on August 29, 2012. The court found, in relevant part:

"[THE COURT:] In this case [defendant] was convicted by a jury trial for violating … Section 459, first degree burglary, also they found true the allegation that another person was present other than an accomplice. He was also found guilty of violating … Section 422, terrorist threats; Count 3 of stalking …. [¶] … [¶]

"Further, the circumstances of this offense are alarming. [Defendant] was bold in his actions, I agree with [the prosecutor] that this is sophisticated in that [he] is able—is psychologically sophisticated and he's able to seek out victims that will not stand up for themselves. [¶] … [¶]

"Circumstances in aggravation include the fact that the crime involved great violence, a threat of great bodily injury, and other acts disclosing a high degree of viciousness and callousness on the part of the defendant. He attacked the victim, pushed her to the ground and began choking her. He also sent multiple text messages to her threatening— threatening her and others. [¶] … [¶]

"The Court designates the appropriate term of the upper term as to Count 1 for violating … Section 459, first degree burglary, that is six years, with a consecutive term of one year for the allegation of another person other than an accomplice being present in the residence at the time of the commission of the offense.

"The Court finds that the remaining crimes are separate acts with sufficient time for reflection therefore 654 does not apply and consecutive sentences will be imposed.

"As to Count 2 the Court is going to impose one-third the midterm or eight months to be served consecutively to Count 1.

"Count 3 for violating … Section 646.9 [stalking], one-third the midterm is one year, and that will also be served consecutive to Count 1."

## B.     The Legal Standards

Section 654 provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The purpose of section 654 is to ensure a defendant's punishment is commensurate with his or her culpability. (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) A course of conduct that constitutes an indivisible transaction violating more than a single statute cannot be subjected to multiple punishment. (*People v. Butler* (1996) 43 Cal.App.4th 1224, 1248.) "If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) The sentences on the remaining counts must be stayed. (*People v. Deloza* (1998) 18 Cal.4th 585, 591-592.)

If, on the other hand, "[the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639; see also *People v. Britt* (2004) 32 Cal.4th 944, 951-952 [whether a course of criminal conduct is divisible so as to allow multiple punishment under § 654 depends on whether defendant had separate objective for each offense].)

Whether multiple convictions were part of an indivisible transaction is primarily a question of fact. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.) We review such a finding under the substantial evidence test (*People v. Osband* (1996) 13 Cal.4th 622, 730-731); we consider the evidence in the light most favorable to respondent and presume the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Holly* (1976) 62 Cal.App.3d 797, 803.) We must determine whether the violations were a means toward the objective of commission of the other. (*People v. Beamon*, *supra*, 8 Cal.3d at p. 639.)

Stalking requires two or more acts of willful, malicious and repeated harassment or following of another person, occurring over a period of time, and a credible threat intended to place the other person in fear for his or her safety or that of his or her family. (See § 646.9; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1196-1197.) Comparatively, a criminal threat does not require a course of conduct but can occur by one discrete act. (*People v. Maciel* (2003) 113 Cal.App.4th 679, 682 [one element of offense is willful threat to commit a crime].)

C.     **Analysis**

We conclude defendant has not met his burden to show the court's finding lacks substantial evidence. As a result, we hold the eight-month term imposed on count 2 need not be stayed pursuant to section 654.

11.

Defendant's actions do not amount to a continuous or indivisible course of conduct. Although his actions occurred within a 24-hour period or so,[4] those acts were separated by sufficient periods of time within which defendant could reflect upon those actions. Moreover, defendant harbored separate intents and objectives.

> "[I]n *People v. Beamon*, *supra*, 8 Cal.3d at page 639, the Supreme Court stated that protection against multiple punishment under section 654 applies to 'a course of conduct deemed to be *indivisible in time*.' (Italics added.) The court added in a footnote: 'It seems clear that a course of conduct *divisible in time*, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]' (*People v. Beamon*, *supra*, fn. 11, italics added.) Thus, a finding that multiple offenses were aimed at one intent and objective does not necessarily mean that they constituted 'one indivisible course of conduct' for purposes of section 654. If the offenses were committed on different occasions, they may be punished separately." (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.)

Here, defendant's actions prior to the physical altercation between him and Marquez at her apartment involved the discrete acts of threatening harm to her property in the form of her vehicle and threatening her employment status and reputation.[5] After assaulting Marquez, defendant's actions escalated to specific threats aimed at both her and her then boyfriend, to wit: "u will hert," "wont stop tell one of use dies tonight," "his turn i make him bleed," "ill walk in appt when ur asleep like i did to gorge," and "spraying his house tonight."

A reasonable trier of fact can conclude defendant's threats to Marquez after the altercation between the two at Marquez's apartment were separated in time from the earlier threats of that same morning, and could be separately punished even if made with the same objective as defendant's other threats and acts. The court also could reasonably conclude the threats made after the altercation were made with a separate intent to

---

[4]The text messages began at 4:20 p.m. on April 23d when defendant advised Marquez he was in town and it was "all bad for [her]." His last message was sent at 3:27 p.m. on April 24th.

[5]Very early that morning, defendant sent a message indicating he was outside Marquez's apartment with his "strap" ready to "smoke sumone."

12.

physically harm Marquez, whereas defendant's stalking behaviors (50 calls a day and/or more than 50 text messages a day after learning she was seeing someone else ) were done with the objective to frighten and harass Marquez for ending their relationship and seeing someone new.  One need not inflict physical harm on another person or damage property to stalk a victim.  (See *People v. Ewing* (1999) 76 Cal.App.4th 199, 210 [elements of stalking include (1) the willful, malicious and repeated harassment of another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear for his or her safety or the safety of his or her immediate family].)

A stalking offense comprises a series of repeated acts over a period of time, some immediately threatening, some not, intending to engender a prolonged state of fear and intimidation. A criminal threat, on the other hand, is a singular act intending to immediately frighten the recipient.

It is clear from this record the criminal threat forming the basis of that element for purposes of stalking—"round 2 i wont stop tell one of use dies tonight" or as argued by the prosecutor "[r]ound two, I won't stop 'til one of us dies"— is not the same as those threats forming the bases for the threats charged under section 422.  Those threats were sent via text message before the altercation at the apartment because, as the prosecutor argued, "she had not been threatened yet—….  He had threatened her property [prior to the incident at the apartment].  [H]e started threatening her person after she got back from her apartment."

Defendant relies upon *People v. Mendoza* (1997) 59 Cal.App.4th 1333 to support his argument.  There, following a preliminary hearing in a case naming his brother as a defendant and at which the victim had testified, the defendant knocked on the victim's door and advised her she had "'fucked up his brother's testimony,' and that '[h]e was going to talk to some guys from Happy Town,'" the street gang to which he and his brother belonged.  A half hour later, the victim spotted the defendant's friend parked across from her home.  She called police.  (*Id.* at pp. 1337-1338.)  The defendant was found guilty of making a threat in violation of section 422 and dissuading a witness by

13.

force or the threat of force in violation of section 136.1. The appellate court held the concurrent sentence imposed for making a criminal threat must be stayed because the two charges arose from a single act, and the primary objective for both of the defendant's acts was to help his brother by preventing the witness from giving further damaging testimony against the brother. (*Mendoza*, *supra*, at p. 1346.) Unlike *Mendoza*, as explained above, here the criminal threat and stalking charges arose from different acts: defendant's text messages to Marquez promising further physical harm after an earlier altercation, and his numerous calls and texts to Marquez over a period of time meant to keep her afraid, or as the prosecutor described it, his efforts to exert "dominion and control" over Marquez.

On this record, we find the criminal threats were independent of and not incidental to defendant's stalking behavior. (*People v. Beamon*, *supra*, 8 Cal.3d at p. 639.) Defendant's acts were not part of an indivisible transaction precluding multiple punishments. (*People v. Avalos*, *supra*, 47 Cal.App.4th at p. 1583.) The trial court's findings are supported by substantial evidence (*People v. Osband*, *supra*, 13 Cal.4th at pp. 730-731), and the purpose of section 654 is not offended because the imposition of the eight-month sentence on count 2 is commensurate with defendant's culpability (*People v. Oates*, *supra*, 32 Cal.4th at p. 1063). Therefore, the trial court did not err.

## II. Ineffective Assistance of Counsel

Defendant argues he was denied the right to the effective assistance of counsel in that defense counsel failed to object to photographs of text messages he purportedly sent to the victim because the photographs were improperly authenticated.

To prevail on an ineffective assistance of counsel claim, an appellant must establish two things: (1) counsel's performance fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105; *People v. Bradley* (2012) 208 Cal.App.4th 64, 86-87.) The *Strickland* court explained that prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, at p. 694.)

14.

Further, the high court stated a reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding. (*Ibid.*)

"The Sixth Amendment guarantees competent representation by counsel for criminal defendants[, and reviewing courts] presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703, citing *Strickland v. Washington*, *supra*, 466 U.S. at p. 690; *People v. Freeman* (1994) 8 Cal.4th 450, 513.) "A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069; see *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Mere speculation does not meet the Sixth Amendment standard for demonstrating prejudice. (E.g., *In re Clark* (1993) 5 Cal.4th 750, 766.)

Although a writing must be authenticated before it is received into evidence or before secondary evidence of its contents may be received (Evid. Code, § 1401), a document is authenticated when sufficient evidence is produced to sustain a finding that the document is what it purports to be. (Evid. Code, § 1400.) A document may be authenticated in a variety of ways. The Evidence Code sets forth some specific, but nonexclusive, means of authentication in sections 1410 through 1421. (*Id.*, at § 1410.) In addition, "Circumstantial evidence, content and location are all valid means of authentication [citations]." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.)

### A.     The Proceedings Below

Prior to the commencement of testimony on the first day of trial, the prosecutor sought to mark photographs for use during trial:

"[PROSECUTOR]: … I'm going to submit my photographs to be marked, unless, [defense counsel] has an objection.

"THE COURT: Why don't you show those to [defense counsel] and see if he has any objections to any of those photographs and we can take care of that.

"(Whereupon the photographs are shown to [defense counsel] and [he] has no objections.)"

During Marquez's trial testimony, after the exhibits were presented, testified to or about, and subsequently sought to be admitted into evidence by the People, when asked by the court whether there was any objection to exhibit Nos. 21 through 28 and 30, defense counsel replied, "Submit it." When the prosecutor offered to admit exhibit No. 29, defense counsel objected "as to foundation. When was that received and where?" The objection was sustained. Marquez then testified as to the date and time of the message, and that defendant sent the message as the message originated from the "phone number he would call [her] from or text [her] from." Thereafter, the exhibit was admitted.

## B.    Analysis

We find counsel's performance did not fall below an objective standard of reasonableness, nor did any prejudice occur.

The photographs depicting the text messages displayed on Marquez's cell phone all reflect the same telephone number. Marquez consistently testified the photographs accurately depicted the text messages she received on April 23 and April 24, 2012. Further, she repeatedly testified the messages originated from a phone number she knew belonged to or was associated with defendant.

Moreover, one of those messages referenced the author's "regret" for having had children with Marquez. And significantly, Marquez testified the phone number associated with the message did *not* belong to the father of her other children. Content of the messages is a proper means of authentication. (*People v. Gibson*, *supra*, 90 Cal.App.4th at p. 383.) Here, the content of the message wherein the sender claims regret

16.

at having children in common with the victim, coupled with her testimony that the phone number associated with the message did not belong to the father of her other children, was proper authentication that defendant was the sender of the text messages. Thus, even absent an authenticity challenge, the prosecution laid the foundation for admission of the photographs of the text messages sent to Marquez's phone. (See *People v. Williams* (1997) 16 Cal.4th 635, 662; *People v. Mayfield* (1997) 14 Cal.4th 668, 747 [recording authenticated by evidence that accurately depicts what it purports to show].) As a result, it cannot be said defense counsel's failure to object to the admission of the photographs of the text messages sent fell below an objective standard of reasonableness. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 687.)

Even for the sake of argument were we to find defense counsel erred by failing to object to the exhibits complained of, considering the second prong of the *Strickland* analysis, we find it is not reasonably probable the result of this proceeding would have been different but for the error. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) Marquez testified, prior to any specific reference to the exhibits themselves, that defendant called her and/or text messaged her 50 times a day, or "all the time," after she told him she was seeing someone else. Without reference to the exhibits themselves, she testified defendant's messages contained profane language and threats directed to damaging her car and her reputation at work. She also testified as to defendant's regret at having had children with her. Again without regard to the exhibits referencing the text messages themselves, Marquez testified to having received about 10 text messages between 6:00 a.m. and 8:30 a.m. when she arrived at work on the date of the incident. And she testified as to her fear of defendant.

Defendant's argument that the "case was essentially a credibility contest between" him and Marquez, and that George's testimony supported his version of events, thus establishing prejudice for purposes of his claim, is unavailing. George's testimony was highly suspect. George testified he let defendant into the apartment that morning, however, he failed to mention that to the investigating officer. He claimed his sister

17.

advised her coworker she would drive herself back to work and he did not see defendant in his sister's room or know where defendant was at that time. That testimony was not only contradicted by Marquez, but by Mendoza, Marquez's coworker, who testified defendant was in Marquez's room and appeared to be blocking her exit. George also claimed to have to ended a relationship with defendant's sister a year prior to his testimony, and yet, he admitted to dating defendant's sister when he was interviewed by the district attorney investigator a week prior to trial. He was also seen sitting with defendant's family in the courtroom and was no longer speaking to his sister at the time of trial. And while George did testify his sister had a history of lying and deceit, he was unable to offer an example or situation wherein Marquez lied "to get herself out of" such a situation. Further, we disagree with defendant's assertion that "evidence that [he] had been at Marquez's apartment a week earlier at her request, when she told [him] that she wished to get back together and [he] refused her offer" supports George's testimony. A review of the relevant passage reveals Marquez testified she and defendant considered reconciling for the sake of the children, but denied that defendant refused to do so.

In light of Marquez's testimony excepting that pertaining to the exhibits complained of, and all of the other testimony taken, it is not reasonably probable a more favorable outcome would have resulted had defense counsel objected to the admission of the text messages. Hence, defendant has not met his burden.

## III. Prior Acts of Domestic Violence

Defendant contends the trial court prejudicially erred by instructing the jury his prior acts of domestic violence could be used as propensity evidence regarding the vandalism charge, and with regard to a finding those prior acts had been proven, that "abuse" meant the destruction of personal property.

### A. Relevant Law and Instruction

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion. [Citations.]" (*People v. Villatoro* (2012) 54 Cal.4th

1152, 1159; see Evid. Code, § 1101, subd. (a).) Evidence Code section 1109, which concerns domestic violence, is a specific exception to the general rule. (*People v. Villatoro*, *supra*, at p. 1159; see also *People v. James* (2010) 191 Cal.App.4th 478, 482.)

With exceptions not relevant here, subdivision (a)(1) of Evidence Code section 1109 provides: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." The trial court's discretion to exclude the propensity evidence under Evidence Code section 352 saves section 1109 from a due process challenge. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14; *People v. Johnson* (2000) 77 Cal.App.4th 410, 418–420; cf. *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

Where instructional error is alleged, we must consider whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law. (*People v. Cain* (1995) 10 Cal.4th 1, 36; *People v. Kelly* (1992) 1 Cal.4th 495, 525–527.) "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 753; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [alleged ambiguity in instructions must be viewed in light of the instructions as a whole and the entire record].)

The relevant pattern jury instruction provides, in pertinent part:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case[, specifically: _____ *<insert other domestic violence alleged>*.]

"*<Alternative A—As defined in Pen. Code*, § 13700>

"[*Domestic violence* means abuse committed against (an adult/a fully emancipated minor) who is a (spouse[,]/ [or] former spouse[,]/ [or] cohabitant[,]/ [or] former cohabitant[,] ….]

"*<Alternative B—As defined in Fam. Code*, § 6211>

19.

"[*Domestic violence* means abuse committed against a (child/grandchild/parent/grandparent/brother/sister) of the defendant.]

"*Abuse* means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else." (CALCRIM No. 852.)

## B.     Consideration of Prior Acts Evidence and Instructions to the Jury

Prior to the commencement of testimony and after the jury had been preliminarily instructed, the evidence of prior acts of domestic violence by defendant was addressed:

"[PROSECUTOR]:  I also wanted to bring up the 1109 evidence in my opening statement and I was wondering if the Court had had an opportunity to review the People's trial brief.

"THE COURT:  I'm just reading it right now.  [¶] [Defense counsel], have you reviewed the trial brief?

"[DEFENSE COUNSEL]:  I have and we discussed it in chambers, too. And based on the People's representation, my opinion was it qualified. And I think you concurred with that.  As far as—I didn't review it.  If there was something else that might be objectionable—was that the only thing you are offering in your opening statement that might be questionable—or in your trial brief?

"[PROSECUTOR]:  Well, the other issue with respect to the trial brief was 1109 evidence as to the alleged victim, [Marquez], and that she had said that there had been prior instances of domestic violence.  I think the officer testified to that in the preliminary hearing, but it was very vague. And a subsequent statement was made to Officer Holsonbake on July 20th. She had said that the defendant had physically abused her and that the physical abuse started when she was three-and-a-half months pregnant [with] her first child.  That was around the fall of 2005.  And that there had been subsequent incidences [*sic*] of physical abuse by the defendant on the victim.

"THE COURT:  All right.  And were police reports generated concerning these incidents?

"[PROSECUTOR]:  There was only one police report generated.  And that was a Coalinga Police Department report from 2008.

"THE COURT:  Was that discovered to [defense counsel]?

20.

"[PROSECUTOR]: It should have been discovered to—it should have been in the initial discovery packet to [him], but I can show him a copy of it right now.

"THE COURT: Well, [defense counsel], are you aware of the 2008 report?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: Okay. So you have that?

"[DEFENSE COUNSEL]: Although, I think to mention it now might be premature depending on how the evidence actually goes. That would be my only objection to it.

"THE COURT: I'm sorry, what is your objection to it?

"[DEFENSE COUNSEL]: Well, that it's premature to mention it because it may not come in depending on how the evidence comes out as to that prior evidence. I thought we were—when we discussed this in chambers, we were talking about a prior alleged victim.

"THE COURT: Right. So, now, we are talking about the victim, who apparently was a victim in prior cases or in prior—

"[DEFENSE COUNSEL]: Allegedly, yes. And, of course, in the police reports, she even indicated that she had been arrested for domestic violence on my client. So I assume the People aren't going to mention that in their opening statement.

"THE COURT: Right. [¶] Well, first of all, your position on the 1108 or 1109 evidence in regard to the present victim and the incident that happened in 2008, what is your position on that?

"[DEFENSE COUNSEL]: Well, I'm not sure. The problem is taken in context of that one incident compared with her statement that she had been arrested for domestic violence on the defendant here misleads the jury. I think there ought to be cross examination as to those points before it's mentioned to the jury. What's happening is the prosecution is trying to set up the jury to get immediate prejudice against my client and I object to it on that basis.

"THE COURT: I'm still not sure what you're objecting to. Are you objecting to her bringing this evidence forward or her mentioning it in her opening statement?

21.

"[DEFENSE COUNSEL]:  Mentioning it in the opening statement because I may be objecting in the trial depending on how it's brought forward.  Let's say she just testifies about this incident, that's what they are limited to. It's only if I open the door to that that I think she can bring it in.

"THE COURT:  No.  1109 evidence is admissible.  [¶] [Prosecutor], are you planning on introducing 1109 evidence?

"[PROSECUTOR]:  Yes.

"THE COURT:  [Defense counsel], your position on that?

"[DEFENSE COUNSEL]: I understand that.  If it's limited to just that one police report incident I won't object to it because it was reported.  And, then, through cross examination, I'll ask her about her statement to the police about being arrested for domestic violence on my client.

"THE COURT:  [Prosecutor]?

"[PROSECUTOR]:  Well, I mean, I think it would be relevant for [defense counsel] to question [Marquez] as to her incidents against the defendant if he's trying to raise a character issue.  But if he raises a character issue as to her propensity for violence, then, I think I can go back and ask her about other incidences [*sic*] that went unreported where she was the victim by [defendant]'s hands.  And if he's going to bring up propensity or character evidence as to the inclination of the victim for violence, then, I think that the character evidence would allow me to bring up propensity for violence as to the defendant, mainly his prior conviction for stalking.

"THE COURT:  And that brings us to the second 1109 evidence that I think you are proposing on introducing is that stalking charge?

"[PROSECUTOR]:  Yes.  [¶] … [¶]

"THE COURT:  In looking at the evidence, it looks like it is—the 2008 domestic violence incident would be admissible as to 1109 evidence. It certainly is relevant.  This is propensity evidence. It is not remote in time and any probative value does outweigh any prejudicial effect.  That analysis is also the same for the stalking conviction …."

Ultimately, the jury was instructed as follows:

"[THE COURT]:  The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically the 2008 incident where [Marquez]'s windows were broken out in her apartment and the 2004 incident where Belen Rebolledo's tire was slashed.

22.

"Domestic violence means abuse committed against an adult who is a person with whom the defendant has had a child or a person who is married to the defendant.

"Abuse means intentionally or recklessly destroying personal property of another.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit a violation of … Section 422, criminal threats, as charged in Count 2; stalking, a violation of … Section 646.9(a), as charged in Count 3; false imprisonment, a violation of … Section 236, as charged in Count 4; vandalism, a violation of … Section 594(a), as charged in Count 5; domestic violence, a violation of … Section 273.5, as charged in Count 6; and assault with force likely to produce great bodily injury, as charged in Count 7.

"If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the respective offenses referenced above. The People must still prove each charge beyond a reasonable doubt.

"Do not consider this evidence for any other purpose."

At trial, Marquez testified about calling the police concerning the 2008 incident in Coalinga:

"[PROSECUTOR:] … In August of 2008, in Coalinga, did you call the police for an instance of domestic violence?

"[MARQUEZ:] Yes.

"Q. Okay. And tell us what happened then.

23.

"A.  Well, it's been several times I've called.  He's broke—well, when he broke my windows.  When I used to have my apartment, he had broken my windows.

"Q.  Okay.  When he broke your windows, what happened just before the time he broke your windows?

"[DEFENSE COUNSEL]:  I'm going to object.  I thought we had a ruling on that.

"THE COURT:  Overruled.

"THE WITNESS:  I didn't see him probably like for a couple of days and he broke my windows because I wouldn't answer his text messages.  I wouldn't answer his phone calls and he broke my windows.

"[PROSECUTOR:]  Did you see him break your windows?

"A.  Yes, I did see him.

"Q.  Tell us how he broke your windows.

"A.  With one of those flash lights—those long flash lights.  He hit both of the windows because the windows were big and he hit both of them.

"Q.  What were the windows connected to?

"A.  To the living room."

## C.    Analysis

Initially, we note defendant did not object to the jury instructions either as proposed or as read to the jury.  Therefore, defendant has forfeited this claim for purposes of appeal.  (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1142.)  In any event, his claim lacks merit.

Defendant contends that because vandalism is not an offense inherently involving domestic violence, it does not qualify as an offense "involving domestic violence" and, thus, the trial court erred in instructing the jury that prior bad acts of domestic violence could be considered for purposes of the vandalism charge.

Domestic violence is defined in section 13700: "'Domestic violence' means abuse committed against [a qualified individual.]" (§ 13700, subd. (b).) "'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (§ 13700, subd. (a).) Evidence Code section 1109, subdivision (d)(3) provides that:

> "'Domestic violence' has the meaning set forth in Section 13700 ….
> Subject to a hearing conducted pursuant to [Evidence Code] Section 352,
> which shall include consideration of any corroboration and remoteness in
> time, 'domestic violence' has the further meaning as set forth in Section
> 6211 of the Family Code, if the act occurred no more than five years before
> the charged offense."

Family Code section 6211 defines domestic violence to require abuse; subdivision (d) of Family Code section 6203 defines abuse to include "engag[ing] in any behavior that has been or could be enjoined pursuant to Section 6320." That section provides that such behavior includes "destroying personal property." (Fam. Code, § 6320, subd. (a).)

This court's opinion in *People v. James*, *supra*, 191 Cal.App.4th 478 is instructive. In that case, the defendant was convicted of first degree burglary after he broke down the door of a woman with whom he previously lived. The issue before us on appeal was whether the trial court erred in admitting evidence of a prior act of domestic violence against one of the defendant's former girlfriends. (*Id*. at p. 480.) We agreed with the defendant that Evidence Code section 1109 only "allows the admission of prior acts of domestic violence when 'the defendant is accused of an offense involving domestic violence.'" (*People v. James*, *supra*, at p. 482.) However, we concluded that "[a]lthough burglary is not, in every instance, an offense involving domestic violence, under the facts of [that] case the crime of burglary was an offense 'involving domestic violence.' Defendant broke down the door of K.M., a person with whom he had a dating relationship, and repeatedly made threatening remarks towards her. His actions placed K.M. in reasonable apprehension of imminent serious bodily injury to herself. Thus, his

25.

actions, which resulted in his conviction for burglary, involved domestic violence." (*Id.* at p. 483.)

Similar to our holding in *James*, today we hold that while vandalism is not, in every instance, an offense involving domestic violence, under the facts here the crime of vandalism was an offense "involving domestic violence." Defendant scratched or defaced Marquez's car immediately after assaulting her in her apartment. More specifically, as Marquez pulled out of the apartment complex parking lot in order to return to work, defendant scratched the driver's side door and front portion of the vehicle, including the hood and headlight. Marquez remained in her vehicle, with the doors locked, while defendant vandalized her car. Defendant's actions placed Marquez in reasonable apprehension of imminent serious bodily injury.

Defendant relies upon *People v. Zavala* (2005) 130 Cal.App.4th 758 to support his position. In that case, the defendant was charged with stalking his wife after she obtained a restraining order. The trial court allowed evidence of prior acts of violence against the wife to prove the defendant's propensity to commit the stalking offense, pursuant to Evidence Code section 1109. The Court of Appeal concluded the acts of prior violence were admissible under section 1101, subdivision (b) of the Evidence Code to prove the defendant's intent and wife's state of mind, but not to prove propensity, because stalking is not a crime of domestic violence within the meaning of section 1109. (*People v. Zavala*, *supra*, at pp. 770-771.) We do not agree with defendant that *Zavala* should control. As the court in *Ogle* held, *Zavala* "overlooks Family Code section 6211, which defines domestic violence more broadly …." (*People v. Ogle*, *supra*, 185 Cal.App.4th at p. 1144.) We find the reasoning of *Ogle* to be sound, despite defendant's argument to the contrary.

While the jury was instructed with a modified version of CALCRIM No. 852, wherein abuse was defined as "intentionally or recklessly destroying personal property of another person"—versus those definitions referring to bodily injury or placing another

26.

person in reasonable fear of such injury—for the foregoing reasons, we conclude this modification was not erroneous.

Defendant contends he was prejudiced by the foregoing instruction. Even assuming error, we find no prejudice.

> "'"[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v.*] *Watson* [(1956) 46 Cal.2d 818].' (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' (*People v. Mena* (2012) 54 Cal.4th 146, 162.)" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

In conducting review under *Watson*, we

> "focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177; see *People v. Beltran*, *supra*, 56 Cal.4th at p. 956.)

While credibility was certainly an issue below, there was strong evidence supporting the judgment and evidence pointing to a different outcome was comparatively weak. Marquez's testimony was largely corroborated. With specific regard to the vandalism alleged, People's exhibit Nos. 12 and 13, and 15 through 19 were admitted into evidence without objection. The exhibits depicted the damage inflicted by defendant on Marquez's vehicle. Marquez's testimony concerning the other crimes alleged was corroborated by the testimony of Mendoza and Officer Martinez. George's testimony, on the other hand, was highly suspect and lacked corroboration.

Moreover, CALCRIM No. 852 provides, and this jury was expressly instructed, that "uncharged domestic violence" crimes are "only one factor to consider along with all

of the other evidence," and the People must prove each charge against defendant beyond a reasonable doubt. We find no prejudice.

In conclusion, the trial court did not prejudicially err in instructing the jury that a prior act of domestic violence involving the destruction of property by defendant could be considered as propensity evidence pursuant to Evidence Code section 1109.

## IV. Unanimity Instruction

Defendant asserts the trial court had a sua sponte duty to instruct the jury with a unanimity instruction[6] as to the burglary, criminal threats, and spousal abuse charges. By failing to so instruct, he contends the prosecution's burden of proof was lessened, and as a result, his federal due process rights were violated.

### A. Relevant Legal Authority

Under the California Constitution, a unanimous jury verdict is required to convict a person of a criminal offense. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The jury must agree unanimously the defendant is guilty of a specific crime. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.)

When a defendant is charged with a single criminal offense, but the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.) This requirement "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Ibid.*) "On the other hand, where the

---

[6]CALCRIM No. 3500 provides as follows:

"The defendant is charged with _____ *<insert description of alleged offense>* [in Count ___] [sometime during the period of _____ to _____].

"The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which (he/she) committed."

evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid*.) A unanimity instruction is required as between discrete crimes, but is not required between theories of a case. Thus, a jury need not be instructed on a determination as to whether the defendant is guilty as a direct perpetrator or as an aider and abettor of that crime. (*Russo*, at pp. 1132-1133.)

As explained in *People v. Russo*, *supra*, 25 Cal.4th at pages 1134 through 1135:

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction."

For example, a jury may convict a defendant of first degree murder without making a unanimous determination as to the theories proposed by the prosecution, e.g., the murder was deliberate and premeditated or it was committed during the course of a felony. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1025; *People v. Beardslee* (1991) 53 Cal.3d 68, 92-93.)

Similarly, unanimity is not required "'when the acts alleged are so closely connected as to form part of one transaction.'" (*People v. Benavides* (2005) 35 Cal.4th 69, 98.) More specifically, "[t]he 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

29.

**B.     Analysis**

### 1.     *The burglary offense*

Defendant contends there is evidence of two different entries into Marquez's apartment.  The first entry was made with the intent to steal Marquez's clothes or commit theft, and the second with the intent to commit domestic violence.  Further, he maintains the prosecutor did not elect one of the acts in arguing defendant was guilty of burglary.

Defendant points to certain language employed by the prosecutor in her closing argument to the jury in support of his assertion that she "argued both acts to the jury." We agree that language does appear in the prosecutor's initial summation of the facts for the jury's consideration on all the charges.  Yet, when the prosecutor specifically referenced the burglary offense in her closing argument, she stated the following:

> "Ladies and gentleman of the jury, the defendant is charged with several counts.  The first one is burglary.  And you have to decide what was the defendant's intent at the time he entered that apartment.  And I think we have a good indication of what his intent was because we saw the text messages.  They were mocking, they were threatening, they were trying to get a rise out of … her.  You think he was walking into that apartment to check on his son?  No.  He was going to walk into that apartment to hurt her, to batter her, to choke her, to spit on her."

Hence, on this record, we find the prosecutor relied upon defendant's initial entry into the apartment—when he arrived and entered the apartment while Marquez was at work—as the act constituting the offense.  (*People v. Russo*, *supra*, 25 Cal.4th at p. 1132.)  As a result, a unanimity instruction was not necessary.

Even assuming for the sake of argument an election was not made, and the jury could have chosen between defendant's entry into Marquez's home in her absence, or his reentry into her apartment immediately prior to the assault when he followed her inside after she had asked a coworker to drive her home, no unanimity instruction was necessary here.  "[T]he offenses are so closely connected [so as] to form a single transaction." (*People v. Thompson* (1995) 36 Cal.App.4th 843, 851.)

The facts adduced at trial established defendant entered Marquez's apartment on the morning of April 24 while she was at work.[7] Defendant called Marquez about 9:40 a.m. and advised her he was inside her apartment. She asked her coworker to drive her home and she arrived at the apartment shortly thereafter. Marquez observed defendant, wearing her clothing, coming down the stairs from her upstairs apartment. The two exchanged words and then Marquez headed upstairs to her apartment. Defendant followed Marquez inside the apartment and into her bedroom, where he closed and locked the door. Defendant then assaulted Marquez.

Under the principles explained in *Russo*, a unanimity instruction was necessary only if the evidence left open the possibility that defendant committed two distinct burglaries and there was a danger the jury might have found him guilty without agreeing on which burglary he committed. That possibility did not exist here because defendant's acts were so closely connected in time as to form part of one transaction. (*People v. Maury* (2003) 30 Cal.4th 342, 423.) The facts here are also unlike the example amounting to two different entries requiring a unanimity instruction noted in *Russo*: "If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts." (*People v. Russo*, *supra*, 25 Cal.4th at pp. 1132–1133.) Simply put, in this case, there were not two discrete burglaries necessitating a unanimity instruction. Rather, defendant's entries into Marquez's apartment—initially while she was at work, then again when she returned home—were "'"'so closely connected as to form part of one transaction.'" [Citation.]" (*People v. Williams* (2013) 56 Cal.4th 630, 682.)

---

[7]Marquez arrived for work at 8:30 a.m.

## 2.     *The criminal threats offense*

With regard to the criminal threats offense, defendant argues Marquez testified to several threats via text message, that any of them could qualify as a criminal threat, and because the prosecutor did not rely on a specific threat in arguing his guilt, reversal is required.

In arguing the People had met their burden with regard to the offense of criminal threats, the prosecutor stated the following:

> "[Defendant is] also charged with criminal threats.  Did he communicate a threat to [Marquez]?  Yes.  We saw several of them on these text messages.  Was [Marquez] scared?  Was she in sustained fear of those threats?  And you heard her.  She said as the day progressed, especially at night, I was afraid.  I thought he was going to hurt me."

The trial court's duty to instruct on unanimity is not triggered "if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when … the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation].  There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. [Citation.]"  (*People v. Jennings* (2010) 50 Cal.4th 616, 679; see *People v. Maury*, *supra*, 30 Cal.4th at p. 423 [unanimity instruction not required where evidence shows multiple acts in a continuous course of conduct]; cf. *People v. Beardslee*, *supra*, 53 Cal.3d at p. 93 ["'[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case'"].)

Here, defendant's threats were made in a continuous course of conduct, namely, the incidents giving rise to offenses committed April 24.  The numerous threats are so closely connected in time and are sufficiently similar in nature.  That is, they involve threats against Marquez's person and threats directed toward the other man she was seeing at the time.  Defendant's threats were not discrete acts, but rather were part of a

single transaction—defendant's response to Marquez's decision to see someone else. (*People v. Russo*, *supra*, 25 Cal.4th at pp. 1134-1135.)

Further, the prosecutor's argument to the jury did not suggest it could find defendant guilty of the crime of criminal threats on either one or more of a series of defendant's text messages versus one or more of a series of defendant's other text messages (or those sent prior to the assault versus those sent after). Instead, the prosecutor's argument weaved the various threatening messages together. (See *People v. Sapp* (2003) 31 Cal.4th 240, 284.) Hence, there was no reason for the jury to differentiate between the threats to come to a conclusion that defendant made some of the threats but not the others.

Lastly, we note the fact the criminal threats constituted a continuous course of conduct for purposes of not requiring a unanimity instruction does not preclude a finding the criminal threats involved multiple criminal objectives for purposes of allowing multiple punishments under section 654. The test under section 654 is distinct from the issue of whether a unanimity instruction is required. Whether a course of criminal conduct is divisible so as to allow multiple punishments depends on whether the defendant had a separate objective for each offense. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208-1209.) In contrast, the unanimity instruction requirement turns on whether the jury might improperly render a guilty verdict without unanimous agreement on the offense that supports the verdict. (*People v. Russo, supra*, 25 Cal.4th at p. 1132.)

### 3. *The spousal abuse offense*

Next, defendant argues that because multiple violations of spousal abuse were presented at trial, and the prosecutor did not focus on one of those acts, the trial court's failure to instruct the jury is error. Defendant points to the "bruises on the outside of" Marquez's arm caused by his having hit her, as well as the "bruises on the inside of her forearm" as the result of his grabbing Marquez, as proof the prosecutor did not focus on one of the acts.

The prosecutor addressed "spousal battery" as follows in her closing argument to the jury: "Do you believe he hit her? That he struck her in the head with his fist? That he pinned her arms down so that she had bruising?"

The evidence demonstrates the injuries to Marquez's cheek, neck, and arms were based on acts so closely connected—namely defendant's striking, choking, grabbing or holding her down—that those acts occurred during one transaction. Thus, the continuous course of conduct exception applies, rendering a unanimity instruction unnecessary. (*People v. Thompson* (1984) 160 Cal.App.3d 220, 224.) We disagree with defendant that *Thompson*'s reasoning is unsound.

### 4. Prejudice

Defendant contends the aforementioned errors were prejudicial. However, we have held the trial court did not err. Nevertheless, even assuming error occurred, any error was harmless.

We acknowledge there is a split of authority on whether the state law harmless error standard articulated in *People v. Watson*, *supra*, 46 Cal.2d 818 or the federal constitutional standard articulated in *Chapman v. California* (1967) 386 U.S. 18 applies to the erroneous failure to instruct on unanimity. (See *People v. Wolfe* (2003) 114 Cal.App.4th 177, 185–186; compare *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536 [applying harmless beyond a reasonable doubt standard] with *People v. Vargas* (2001) 91 Cal.App.4th 506, 561-562 [applying no reasonable probability of prejudice standard].)

Under *Chapman v. California*, *supra*, 386 U.S. 18, "where the defendant offered the same defense to all criminal acts and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error. [Citation.] … The error is also harmless '[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence ….' [Citation.]" (*People v.*

*Hernandez* (2013) 217 Cal.App.4th 559, 577; see *People v. Jones* (1990) 51 Cal.3d 294, 307; *People v. Thompson, supra,* 36 Cal.App.4th at p. 853.)

Here, the case primarily relied upon Marquez's testimony for defendant's burglary, criminal threats, and spousal abuse convictions. Defendant did not testify, and George's testimony was highly suspect. This trial involved a question of credibility, and the jury's verdicts necessarily implied that it believed Marquez. The jury's verdicts reflect it resolved the credibility dispute against defendant and, thus, it would have convicted him of all alleged offenses. That is, the jury would have convicted defendant regardless of whether a unanimity instruction was given on those crimes. Therefore, any error by the trial court in not giving a unanimity instruction was harmless.

## V. Trial Court's Exclusion of Evidence Supporting the Defense Theory

Defendant maintains his federal due process rights were violated when the trial court excluded evidence of Marquez's drug use and previous attempt to stab him because that evidence related to his theory of the case: He went to the apartment because he was concerned about Marquez using drugs in their son's presence.

### A. The Relevant Proceedings Below

At trial, during defense counsel's cross-examination of Marquez, the following colloquy occurred:

"[DEFENSE COUNSEL:] Q. And you instigated a conversation about getting back together; isn't that correct? You wanted to get back together with [defendant] for the kids' sake?

"A. Yes.

"Q. Correct?

"A. Yes.

"Q. And [defendant] told you he didn't want to do that?

"A. No.

"Q. He didn't tell you I'm concerned about your drug use?

35.

"A.  No.

"[PROSECUTOR]:  Objection at this point.

"THE WITNESS:  No.

"[PROSECUTOR]:  And I'd move to strike.

"THE COURT:  Sustained.  [¶] [Defense counsel], approach, and [prosecutor].

"(Whereupon, there was a sidebar held.)

"THE COURT:  We're going to have a short recess….

"(Whereupon, the following proceedings were held outside the presence of the jury.)

"THE COURT:  [¶] … [¶] [Defense counsel], we had had a discussion at the bench here where you had discussed—we were discussing some things that you had just discovered from talking with some witnesses.  One of those was about this witness's drug use.  And, at that time, our discussion at the bench was that her drug use was not relevant.

"[DEFENSE COUNSEL]:  I thought the Court indicated her actual use with somebody else wasn't going to be permitted, at least, at this point.

"THE COURT:  What relevance is any drug use for the purposes of this trial?

"[DEFENSE COUNSEL]:  Well, here's the way I see it:  And as I'm thinking through this and digesting it, it's the People's theory that my client comes over there on the 24th because he's jealous.  And the truth of the matter is, the way my client explains it to me, is that he was concerned about her using drugs, allegedly—he hadn't seen her do this—but in the presence of her son—of their son together.  I was addressing that only about this reason for being over there as opposed to the jealousy factor.

"THE COURT:  If you want to get that in, your client is going to have to testify.

"[DEFENSE COUNSEL]:  That's fine.

"THE COURT:  [Prosecutor], you are not to go into the drug use.  I see no relevance of asking questions about drug use, about drug dealers, any of that.  It is not relevant for the purposes of this trial.

36.

"[DEFENSE COUNSEL]: Let me go one step further so we get a ruling on this, then. That at this meeting a week or two—as I understood it, it was a week or two before the 24th—my client goes over there and [Marquez] wants to go back to my client and he does not want to. She pulls a knife on him and tries to stab him in front of her son—of their son.

"THE COURT: What's the relevance?

"[DEFENSE COUNSEL]: Again, showing that the purpose of being over there is not because he's jealous about this new alleged boyfriend, but because he doesn't want to go back with her. And it actually—why doesn't he want to go back with her? That's the very point I'm talking about. Because of his concerns about how she neglects her son and is maybe using drugs in front of him.

"Also, part of the thing that was told to me was that since that event, she has told George's sister that she was sorry that that happened, but since she pulled the knife and tried to stab my client, she used drugs every day since then prior to the alleged incident on the 24th. So that would [a]ffect her recall and observations and perception of things that happened on the 24th, too. So, again, that's part of the relevancy.

"THE COURT: [Prosecutor]?

"[PROSECUTOR]: I think that any drug use by [Marquez] would be irrelevant. And if we want to have a 402 hearing as to whether or not she was under the influence of methamphetamine, that's fine. We can get Officer Martinez to come up and say whether or not he believed she was exhibiting signs of being under the influence. Which I don't think it's even necessary to take that step, but we can. She was at work at the time.

"First of all, I don't think a prior incident of [Marquez] allegedly assaulting the defendant a week prior would even be relevant. And if the defense wants to bring in prior instances of violence as to the victim, then, I think that opens up a whole pot of kettle of fish as to People bringing in prior instances of violence of the defendant under Evidence Code 1103.

"And, honestly, I think that all of this talk about drug use and whether or not the victim was using drugs in the months or days or weeks before this particular incident is irrelevant. It's a waste of time. It should be excluded under Evidence Code Section 352. [¶] And I'll submit on those comments.

"THE COURT: Go ahead, [defense counsel].

37.

"[DEFENSE COUNSEL]: It goes beyond just the fact whether or not she's under the influence because people can function. They can go to work. We have what we call functional addicts. So whether the officer felt she was under the influence or not, that's not my crucial point. The crucial point is to counter the People's theory of this case that my client is over there out of a fit of jealousy and these text messages that are being sent.

"THE COURT: So these text messages are being sent because of his concern for his children?

"[DEFENSE COUNSEL]: The text messages—I understand that. But I haven't heard that is even my client's number other than this woman saying that. My client didn't even have a cell phone in his name, she could be fabricating all of this, your Honor.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: I don't know.

"THE COURT: Is it submitted?

"[DEFENSE COUNSEL]: I'll submit it.

"THE COURT: All right. There will be no questioning at this point about drug use.

"[DEFENSE COUNSEL]: Okay.

"THE COURT: The incident where allegedly this witness came after [defendant] with a knife is not admissible. It is irrelevant. This has to do with what happened on April 24th. And that's the ruling."

## B.     The Applicable Law

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." Section 351 of that same code provides that "all relevant evidence is admissible." Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence Code section 352 states that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) creates substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The trial court's determination whether evidence has sufficient relevance to be admitted is reviewed for abuse of discretion. (*People v. Sanders* (1995) 11 Cal.4th 475, 554–555.) Exclusion of defense evidence pursuant to Evidence Code section 352 ordinarily does not infringe on the defendant's due process right to present a defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 414.) Although Evidence Code section 352 must bow to a defendant's right to present evidence (*People v. Burrell–Hart* (1987) 192 Cal.App.3d 593, 599), that principle only applies where the evidence has "significant probative value" and "does not mean the court must allow an unlimited inquiry into collateral matters …." (*People v. Marshall* (1996) 13 Cal.4th 799, 836.) An appellate court will not disturb a trial court's exercise of discretion in admitting or excluding evidence "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) When a trial court misapplies Evidence Code section 352 to exclude defense evidence, the applicable standard of prejudice is whether it is reasonably probable the verdict was affected. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

## C.    Analysis

The allegations pertaining to Marquez's purported drug use were collateral at best. The content of defendant's text message "calling ur work to have them test u," coupled with Marquez's testimony on direct examination that she understood defendant's message to mean he was going to call her employer and ask that she be tested because she was "under the influence of drugs," placed that issue before the jury. Defense counsel argued his theory to the jury that defendant went over to Marquez's apartment to check on his son. He stated the jury "didn't hear the reason why," but the inference can be made from the content of defendant's text message and Marquez's testimony. Thus, the trial court did not preclude defendant from presenting his defense on this basis. Rather, it merely excluded some evidence on the issue. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203 [trial court merely rejected some evidence concerning a defense and

39.

did not preclude defendant from presenting a defense].) We perceive no due process concerns pertaining to the exclusion of the evidence.

Defendant claims the drug use evidence would have also bolstered his claims that Marquez was not credible, relevant to his theory that Marquez lied. As to Marquez's credibility, the additional evidence defendant sought would have been of little relevance or probative value. The jury heard testimony and considered evidence in the form of defendant's text message referencing Marquez's use of drugs. And while defense counsel did not reference defendant's text message or Marquez's testimony regarding the message, he did argue to the jury in closing that Marquez was "lying about a lot of things," she was "making [things] up," and George's testimony supported defendant's assertions regarding Marquez's lack of credibility.

Defendant claims the evidence that Marquez attempted to stab him some two weeks prior also had "enormous relevance" to his defense theory and, therefore, exclusion of that evidence was error. First, the court notes defendant's interpretation of Marquez's testimony concerning their previous discussion about reconciliation is erroneous. Marquez did not testify that defendant told her he did not wish to get back together with her; rather, she testified he said no such thing. Specifically, in response to the question whether defendant told Marquez he "didn't want to do that," Marquez answered, "No." Next, the court properly determined evidence that Marquez purportedly tried to stab defendant two weeks prior to the incident giving rise to the charges was not relevant because it did not relate to what occurred on April 24th. It was collateral to those incidents and thus had only slight or limited probative value. (*People v. Ayala* (2000) 23 Cal.4th 225, 282 [while a defendant has the right to present evidence relevant to theory of defense, this right "does not require 'the court [to] allow an unlimited inquiry into collateral matters'"]; *People v. Reeder* (1978) 82 Cal.App.3d 543, 553.)

Defendant further argues error occurred because the trial court did not cite to nor engage in an analysis pursuant to Evidence Code section 352. He is mistaken. "A trial court is not required to '"expressly weigh prejudice against probative value or even

expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing function under Evidence Code section 352.'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1285.)" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 31.) Here, the record shows the trial court properly performed this task. The issue had been discussed prior to Marquez's testimony on cross-examination, at sidebar, and again outside the presence of the jury. On the whole, the record establishes the court found the evidence to be irrelevant and its probative value to be outweighed by its prejudice.

Even were we to assume the trial court erred in excluding additional evidence of Marquez's drug use and the allegation she attempted to stab defendant prior to the incidents in question, we find any error to be harmless. After examining the entire record, it is not reasonably probable defendant would have achieved a more favorable result had this evidence been admitted. (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant contends these alleged errors "'effectively eviscerated'" his defense. But his argument ignores the weight of the evidence against him. The text messages clearly established defendant was the aggressor on the day in question. Defendant messaged Marquez he was going to or intended to damage her car: "nice scraches on your car" and "i am frying ur car." He advised Marquez to "watch bitch when u lest expect it." Additionally, defendant repeatedly messaged her "ha ha bitch."

Even after physically assaulting Marquez—which was evidenced by the bruises and marks on her body that could be observed in photographs admitted into evidence and corroborated by the testimony of Mendoza—defendant continued to play the aggressor's role. He messaged, "Now his turn i make him bleed in front of his family then tonight u," referring to the man Marquez was dating, "now u will hert," and "round 2 i wont stop tell one of use dies tonight." Defendant also referenced "spraying [her new boyfriend's] house tonight," as well as the use of a knife.

In sum, we conclude the trial court did not abuse its discretion in excluding the aforementioned evidence. Moreover, even if error occurred, considering the record as a

41.

whole, it is not reasonably probable that, had the evidence been admitted, defendant would have received a more favorable result.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
FRANSON, J.